



FILED

Oct 24 2023, 11:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-CP-115

## Tonia Land, individually and on behalf of all others similarly situated,
*Appellant (Plaintiff below)*

—v—

## IU Credit Union,
*Appellee (Defendant below).*

---

Argued: June 29, 2023 | Decided: October 24, 2023

Appeal from the Monroe Circuit Court,
No. 53C06-2103-PL-562
The Honorable Holly M. Harvey, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 22A-CP-382

---

**Opinion by Justice Goff**

Chief Justice Rush and Justices Slaughter and Molter concur.

Justice Massa dissents with separate opinion.

**Goff, Justice.**

A basic tenet of American contract law holds that "an offeror is master of his offer."[1] However, the offeror's control over the form of acceptance may be limited to protect the offeree's contractual freedom.[2] One such limitation arises when the offeror purports to dictate acceptance by the offeree's silence or inaction. While silence or inaction may, in exceptional circumstances, constitute acceptance, we find no such circumstances here. We thus reverse the trial court and remand for further proceedings consistent with this opinion.

# Facts and Procedural History

The IU Credit Union (or IUCU) is a not-for-profit, member-owned financial cooperative that provides a variety of banking services. Tonia Land is a member of, and maintains at least two checking accounts with, IUCU. When she first became a member, Land received an "Account Agreement," the terms of which are "subject to change at any time" as permitted by law. App. Vol. II, p. 43. IUCU agreed to notify its members of any changes in the Agreement's terms, either by U.S. mail or (for those who agreed to receive notices electronically) by email.

When Land later registered for online banking for one of her checking accounts, she received by email a second agreement (referred to here as the Disclosure), which permitted IUCU to "modify the terms and conditions applicable to the Services from time to time" and to "send any notice to [Land] via email." *Id.* at 118. Under the terms of the Disclosure, Land is deemed to have received any such notice "three days after it is sent." *Id.* Land's agreement to these terms required her to click "Accept." *Id.* at 119.

---

[1] K. N. Llewellyn, *On Our Case-Law of Contract: Offer and Acceptance, I*, 48 Yale L.J. 1, 33 (1938) (internal quotation marks omitted).

[2] Avery Katz, *The Strategic Structure of Offer and Acceptance: Game Theory and the Law of Contract Formation*, 89 Mich. L. Rev. 215, 250 (1990).

In 2019, IUCU sent to its customers a proposed modification to the Agreement (referred to here as the Addendum). The terms of this Addendum (1) permitted either party to require arbitration to resolve disputes without the other party's consent and (2) prohibited members from initiating or joining a class-action lawsuit. *Id.* at 127. The Addendum also specified, under a heading in bold and in all-capital letters, the member's "right to opt out" of the arbitration Addendum if he or she so informed IUCU within 30 days of receiving notice. *Id.* To "opt out" required the member to send IUCU "written notice" at a specific address. *Id.* Otherwise, according to its terms, the Addendum became binding on the member.

Because Land maintains only one of her checking accounts online, IUCU sends her monthly statements and change-of-terms notices by regular U.S. mail and by email. IUCU adhered to this arrangement when sending her the Addendum. In the **email** it sent, the subject line used the same language used for monthly accounts statements, indicating only that a "New eStatement" was available "in Online Banking." *Id.* at 178. The body of the email itself mentioned nothing about the Addendum. But a link in the email would have directed Land to her five-page monthly account statement, the first page of which referenced the Addendum in bold, all-capital letters and directed her to review the updated terms "at the end of [the] statement." *Id.* at 123. The document Land received by **regular U.S. mail** consisted of a two-page monthly account statement, the first page of which likewise noted the Addendum in bold, all-capital letters and directed her to review the updated terms "included in this mailing." *Id.* at 212. Land claims to have seen **neither** version of the Addendum. And she never notified IUCU of her preference to opt out.

Land later filed a class-action complaint against IUCU, alleging wrongful assessment of overdraft fees, breach of contract, breach of duty of good faith and fair dealing, unjust enrichment, and a violation of Indiana's Deceptive Consumer Sales Act. Citing the Addendum, IUCU moved to compel individual (rather than class) arbitration. After a hearing, the trial court ruled in favor of IUCU, having found "an enforceable agreement to arbitrate" between the parties. *Id.* at 10.

On discretionary interlocutory appeal, the Court of Appeals reversed, holding that IUCU failed to provide reasonable notice to Land by either email or regular mail. *Land v. IU Credit Union*, 201 N.E.3d 246, 251 (Ind. Ct. App. 2022). As persuasive support, the panel relied in part on its then-vacated-but-not-yet-supplanted decision in *Decker v. Star Financial Group, Inc. Id.* at 249–50 (citing 187 N.E.3d 937 (Ind. Ct. App. 2022), *vacated*, 204 N.E.3d 918 (Ind. 2023)). As an alternative ground for invalidating the Addendum, the panel held that Land's silence and inaction did not constitute acceptance under section 69 of the Restatement (Second) of Contracts. *Id.* at 253.

IUCU petitioned for transfer, which we granted, thus vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

# Standard of Review

This Court reviews questions of contract interpretation de novo. *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 206 (Ind. 2022). A de novo standard likewise applies to a trial court's decision on a motion to compel arbitration. *Doe v. Carmel Operator, LLC*, 160 N.E.3d 518, 521 (Ind. 2021).

# Discussion and Decision

Indiana recognizes a strong policy interest in favor of enforcing arbitration agreements. *Decker v. Star Fin. Grp., Inc.*, 204 N.E.3d 918, 920 (Ind. 2023). But a presumption in favor of arbitration without first determining whether the parties agreed to such a method of dispute resolution threatens to "frustrate the parties' intent and their freedom to contract." *MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004). The party seeking to compel arbitration carries the burden of showing the existence of an enforceable arbitration agreement. *Progressive Se. Ins. Co. v. Empire Fire & Marine Ins. Co.*, 88 N.E.3d 188, 197 (Ind. Ct. App. 2017). In deciding whether this burden has been met, courts apply ordinary principles of contract law. *MPACT Const.*, 802 N.E.2d at 906. So, an arbitration agreement, as with a typical contract,

requires "offer, acceptance of the offer and consideration." *Reitenour v. M/I Homes of Indiana, L.P.*, 176 N.E.3d 505, 510–11 (Ind. Ct. App. 2021) (internal quotation marks and citation omitted). And while the parties may modify their contract, such modification, which amounts to a contract itself, requires all the elements of a contract. *Stelko Elec., Inc. v. Taylor Cmty. Sch. Bldg. Corp.*, 826 N.E.2d 152, 159 (Ind. Ct. App. 2005).

The parties here dispute the binding effect of the Addendum. Land argues that IUCU's failure to give reasonable notice, along with her silence in response to IUCU's offer, renders the Addendum invalid.[3] IUCU, on the other hand, contends that it fulfilled its notice obligations by sending the Addendum to Land according to the terms of the Agreement and that Land's silence and inaction amounted to acceptance of the Addendum.

## I.  IUCU provided Land with reasonable notice of its offer to amend the Agreement.

On the issue of notice, IUCU's argument is twofold: First, IUCU challenges the applicable standard. And second, IUCU contends that its notice to Land sufficed as an offer to amend the Agreement. We address these arguments in turn.

### A.  A reasonableness standard applies to the interpretation of the parties' agreed terms of notice.

IUCU first argues that, by relying on the vacated opinion in *Decker*, the Court of Appeals unjustifiably adopted a heightened standard for what constitutes sufficient notice under a contract. Pet. to Trans. at 13. While the contract itself in *Decker* spoke of "reasonable notice," IUCU contends, nothing in the court's opinion there suggests that such a standard is "now

---

[3] Land also argues that the terms of the original account Agreement did not permit the unilateral addition of the Addendum. Appellant's Br. at 34–41. Because we resolve this case in her favor on other grounds, we need not address this argument.

required as a matter of judicially created law" **regardless** of the terms of a contract. *Id.* at 14. Instead, IUCU submits, the Agreement and Disclosure set forth the agreed-upon terms for notice and it fulfilled those notice obligations. *Id.* at 13.

We disagree with IUCU's characterization of the issue.

The question is not whether a pure reasonableness standard always governs notice. This Court will "defend the freedom of contract by enforcing parties' agreed terms," whether those terms call for notice by email, regular U.S. mail, or other means. *See Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 758 (Ind. 2018). Thus, insofar as the contracting parties agree on what constitutes effective notice, their agreement controls. But to the extent an agreement fails to define notice, this Court **will** apply a reasonableness standard as an exercise in contract interpretation.

Here, for example, the original Agreement's notice-of-amendment clause specified that members would receive an email informing them "that a **new notice** is available" for review. App. Vol. II, p. 43 (emphasis added). The Agreement thus defined what would constitute notice by email. The Agreement does not, however, define what constitutes "written notice," other than saying it is effective once properly mailed. *Id.* In analyzing whether IUCU complied with the Agreement's terms of notice by mail, we apply an "objective theory" of contract interpretation. *See Akin v. Simons*, 180 N.E.3d 366, 377 (Ind. Ct. App. 2021). In other words, it becomes a question of reasonableness for the courts to decide as a matter of law. *See Indiana Farm Bureau Ins. Co. v. Harleysville Ins. Co.*, 965 N.E.2d

62, 68 (Ind. Ct. App. 2012) (noting that "what constitutes reasonable notice is a question of law for the court to decide") (citation omitted).[4]

Land received two notices of the Addendum in the account statements sent to her from IUCU—one by email and one by regular U.S. mail. The email notice contained an inconspicuous subject line (making no indication of a change in terms), and the body of the email itself said nothing of the Addendum. Instead, it informed Land that she "ha[d] a new eStatement to retrieve," **not** that she had a "new notice" to review, as the Agreement required. *Compare* App. Vol. II, p. 178, *with id.* at 43. But even if the email notice did not qualify as effective notice as defined in the Agreement, the notice sent to her by regular U.S. mail, as discussed below, did constitute reasonable notice.

## B. IUCU's mailing efforts met the reasonable-notice standard.

In arguing that its mailing efforts were sufficient to notify Land of the Addendum, IUCU relies on *Neal v. Purdue Federal Credit Union*, 201 N.E.3d 253 (Ind. Ct. App. 2022). Pet. to Trans. at 10–13. Land distinguishes *Neal* on grounds that the notice issue in that case was waived and that (waiver

---

[4] Commensurate with this objective standard, Indiana courts have recognized the need for "reasonable notice" in a variety of contractual arrangements, including for a contracting party to properly assent to an offer. *See, e.g.*, *Adsit Co. v. Gustin*, 874 N.E.2d 1018, 1023 (Ind. Ct. App. 2007) ("To determine whether a clickwrap agreement is enforceable, courts presented with the issue apply traditional principles of contract law and focus on whether the plaintiffs had **reasonable notice** of and manifested assent to the clickwrap agreement.*)* (quotation and citation omitted); *T-3 Martinsville, LLC v. US Holding, LLC*, 911 N.E.2d 100, 116 (Ind. Ct. App. 2009) (holding that a landlord, before terminating a lease, was "required to give **reasonable notice**" to a tenant, with an opportunity to cure its default); *Consumers' Gas Tr. Co. v. Littler*, 162 Ind. 320, 328, 70 N.E. 363, 366 (1904) (holding that a contracting party must give the other contracting party "**reasonable notice** of his intention" to claim a forfeiture) (all emphases added).

aside) the notice there was "demonstrably better" than the one here.[5] Resp. to Trans. at 8, 13–14.

Land is correct that the notice issue in *Neal* was waived. *See* 201 N.E.3d at 262 n.5. But, waiver notwithstanding, we disagree with Land that the notice there was "demonstrably better" than the one here. The opinion in *Neal* provides an incomplete picture of the bank's noticing efforts. All we know is that the bank there sent the customer hard copies of her monthly and quarterly account statements, which included an arbitration addendum similar to the one here. *Id.* at 257–59.[6] The panel gave no indication of how many pages those account statements consisted of, whether they referenced the enclosed addendum, or whether any such reference was conspicuously placed in those statements. *See id.*

Turning to the reasonableness of IUCU's notice efforts here, we begin by noting that this is **not** a case in which a bank sent an account statement to its customer "along with copious piles of junk mail." *See Kortum-Managhan v. Herbergers NBGL*, 204 P.3d 693, 699 (Mont. 2009) (internal quotation marks omitted). Rather, the monthly statement **itself** contained the Addendum. A monthly bank statement, much like a credit-card billing statement, "contains information at the heart of the service relationship," making it "well-suited" to communicate change-of-terms notices and other important information. *See Hart v. Charter Commc'ns, Inc.*, No. SA CV 17–556–DOC (RAOx), 2017 WL 6942425, at *5 (C.D. Cal. Nov. 8, 2017), *aff'd*, 814 Fed. Appx. 211 (9th Cir. 2020). In addition to providing Land with a detailed list of account transactions (both debits and credits), the monthly account statement provides important contact information for member service, the account's beginning and ending balance, the total number of withdrawals, the amount of fees she incurred (including

---

[5] Land also dedicates several pages in her briefings to analogizing the notice efforts here to those in *Decker*. Appellant's Br. at 26–28, 32; Resp. to Trans. at 14–15. But because we vacated the Court of Appeals' opinion in that case, and because we didn't decide the issue of reasonableness of notice on transfer, we decline a comparative analysis.

[6] In a separate section of its opinion, the court notes that the arbitration addendum was sent as a "standalone hard copy." 201 N.E.3d at 262 n.5.

overdraft fees and returned-item fees), the total dividends paid to her (if any), her balance due on any outstanding loans, the annual percentage rate for those loans, and the payments she's made toward those loans. A monthly account statement also offers insight into spending habits. *See* Consumer Fin. Prot. Bureau, *Assess Your Spending*, https://www.consumerfinance.gov/owning-a-home/prepare/assess-your-spending [https://perma.cc/CV5G-F9FA] (last visited Oct. 23, 2023). And it may help a customer discover unauthorized transactions that require further action. It makes sense, then, for IUCU to have included its proposed modification to the Agreement among this information.

Second, Land's argument that the Addendum was "buried" at the "back of [the account] statement" carries little persuasive weight. *See* Resp. to Trans. at 14. That statement was a mere **two pages**, the first of which clearly referenced the Addendum (in bold, all-capital letters) and the second of which was the Addendum itself. App. Vol. II, pp. 212–13. Had Land simply glanced at the account statement, she would have easily seen the reference to the Addendum and the language directing her to "review the added language." *Id.* at 212.

In short, IUCU provided Land with reasonable written notice of its offer to amend the Agreement. This conclusion, however, does not end our inquiry. As noted above, a binding arbitration agreement, as with any contract, requires not only an offer but also an acceptance of that offer. *Reitenour*, 176 N.E.3d at 511. Whether Land accepted IUCU's offer is the question we turn to next.

## II. Land's silence and inaction did not amount to assent.

IUCU argues that the terms of the Addendum gave Land "'reason to understand that [her] assent may be manifested by silence or inaction.'" Appellee's Br. at 36–37 (quoting Restatement (Second) of Contracts § 69(1)(b) (Am. L. Inst. 1981)). And the "course of dealing" between them, IUCU submits (referring to the existing Agreement and Disclosure), also "gave Land reason to know that her continued use of her accounts

without opting out would constitute acceptance of a change in the Agreement." *Id.* at 37 (quoting Restatement (Second) of Contracts § 69(1)(c)). For her part, Land acknowledges that "silence can, in limited circumstances, be used to show a party accepted and assented to an offer." Appellant's Br. at 23. But acceptance by silence, she insists, is the exception rather than the rule, and the circumstances here present no such exception. *Id.*

We agree with Land.

Section 69 of the Restatement (Second) of Contracts (on which Land and IUCU both rely) recognizes a party's silence or inaction as acceptance in only three exceptional circumstances:

(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restatement (Second) of Contracts § 69(1).[7]

Here, IUCU explicitly notified Land that the failure to opt out of the arbitration Addendum within 30 days of receiving notice would bind her to the Addendum. But the "mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69 cmt. c. Instead, IUCU must show that Land "in remaining silent and inactive intend[ed] to accept the offer." *See id.* § 69(1)(b). Under the Restatement, the "case for acceptance is strongest" when the offeree's "reliance is definite and substantial" or when the offeree's "intent to accept is objectively manifested though not communicated to the offeror." *Id.* § 69 cmt. c. Even assuming Land was aware of the offer to arbitrate (which she disputes), there's no evidence of her "definite and substantial" reliance on the proposed arbitration Addendum. *See id.* In fact, by filing a class-action complaint with the trial court, Land's actions point in the opposite direction.

We likewise find no objective manifestation of intent to accept through Land's continued use of her checking accounts. To begin with, nothing in the Agreement or the Disclosure suggested that silence and continued use of the accounts would result in acceptance of any future modification to those original contracts. *Cf. Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641, 647 (N.D. Ohio 2007) (holding that a customer's use of the credit card bound him to the original agreement's arbitration clause);

---

[7] While this Court has never applied section 69 of the Restatement (Second) of Contracts, our Court of Appeals has relied on it when analyzing issues of contractual assent by silence or inaction. *See, e.g., Neal*, 201 N.E.3d at 262–63; *Mueller v. Karns*, 873 N.E.2d 652, 657–58 (Ind. Ct. App. 2007). By joining the Court of Appeals, we aim to "promote consistency in contracting practices among businesses and instill a greater sense of fairness among consumers in carrying out their contractual obligations, ultimately reducing the need for judicial intervention." *Decker*, 204 N.E.3d at 924 (Goff, J., concurring in the judgment). Adopting section 69 also aligns with this Court's frequent reliance on other sections of the Restatement (Second) of Contracts. *See, e.g., Allen v. Clarian Health Partners, Inc.*, 980 N.E.3d 306, 309–10 (Ind. 2012) (citing section 33 for the proposition that the terms of a contract must be "reasonably certain"); *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 539 (Ind. 1997) (citing section 202 for the proposition that words used in a contract may be construed to avoid absurdity); *Jarboe v. Landmark Cmty. Newspapers of Indiana, Inc.*, 644 N.E.2d 118, 121 (Ind. 1994) (citing the doctrine of promissory estoppel under section 90).

*Meyer v. Nat. City Bank*, 903 N.E.2d 974, 976 (Ind. Ct. App. 2009) (holding that a customer assented to a credit card agreement where the agreement expressly stated that use of the card constituted acceptance and the customer in fact used the credit card); *Weldon v. Asset Acceptance, LLC*, 896 N.E.2d 1181, 1182, 1187 (Ind. Ct. App. 2008) (finding implied assent to arbitrate a dispute where customer repeatedly used his credit card and the original agreement contained an arbitration clause). Moreover, nothing in IUCU's offer to amend those original contracts (in the form of the proposed arbitration Addendum) conditioned continued use of the accounts on acceptance of the Addendum. To the contrary, a member could "opt out" of the proposed agreement to arbitrate and continue to use the accounts without being bound by the Addendum. *See* App. Vol. 2, p. 127.

Finally, we find nothing in the record to indicate a "course of dealing" to give IUCU or Land any reason to understand that Land's silence would constitute acceptance.[8] IUCU points to the Disclosure that Land entered into when she first registered for online banking. Because the Disclosure informed Land that continued use of her accounts was an "acknowledgment" of her "inten[t] to be bound" by all agreements she had entered into, IUCU contends, Land knew that continued use of those accounts without opting out of the Addendum would result in acceptance of the agreement to arbitrate. Appellee's Br. at 37. We disagree. When Land registered for online banking, IUCU required her to agree to the terms of the Disclosure by clicking "Accept." App. Vol. II, p. 119. Rather than suggesting that Land's silence would amount to acceptance, the parties' previous dealings point in the opposite direction: the need for **affirmative assent**.[9]

---

[8] Because the Court of Appeals' decision in *Neal* reached the opposite conclusion under a strikingly similar set of circumstances, *see* 201 N.E.3d at 263, we expressly disapprove that case to the extent that it conflicts with our holding today.

[9] This fact also undermines IUCU's argument that "to get an affirmative response from all of its members to a proposed amendment would require it to hire an army to track them down and force them to sign in wet ink or click a button." *See* Pet. to Trans. at 10.

# Conclusion

For the reasons above, we hold that, while IUCU provided Land with reasonable notice of its offer to amend the Agreement, Land's subsequent silence and inaction did not amount to acceptance of the Addendum. Thus, with no enforceable agreement to arbitrate, we reverse the trial court and remand for further proceedings consistent with this opinion.

Rush, C.J., and Slaughter and Molter, JJ., concur.
Massa, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT
Tyler B. Ewigleben
Lisa M. LaFornara
Vess A. Miller
Lynn A. Toops
Cohen & Malad, LLP
Indianapolis, Indiana

Matthew R. Gutwein
DeLaney & DeLaney LLC
Indianapolis, Indiana

John Steinkamp
John Steinkamp & Associates, P.C.
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE
James R. Branit
Phillip G. Litchfield
Litchfield Cavo LLP
Chicago, Illinois

**Massa, J., dissenting.**

On the same day the Court of Appeals issued its opinion in this case, a different panel of that Court decided an almost identical case between Purdue Federal Credit Union and one if its members, coming out the other way. *Neal v. Purdue Fed. Credit Union*, 201 N.E.3d 253 (Ind. Ct. App. 2022), *trans. not sought*. Because I concur in the reasoning of that panel, and because I am concerned that today's decision could upend long-accepted business practices of companies with large customer bases in Indiana — from Netflix to Citibank and thousands of smaller institutions in between — I respectfully dissent. The IU Credit Union provided Land an opportunity to opt out, without losing her banking privileges;[1] all she had to do was send written notice within thirty days. *Ante*, at 3. The option was neither burdensome nor unreasonable, but the consequences of our decision today may turn out to be both.

---

[1] While we did not reach this issue in *Decker v. Star Financial Group, Inc.*, 204 N.E.3d 918 (Ind. 2023), I find it helpful to compare the facts of this case with *Decker* to show how Land was unburdened by IU Credit Union's directions on how to opt out of the arbitration Addendum. In *Decker*, the bank sent its members an arbitration addendum that noted its terms would be effective within ten days if members retained their accounts with Star Financial. *Decker*, 204 N.E.3d at 920. This meant that if members wanted to opt out of arbitration, they would have the burden of closing their accounts with the bank within ten days of the letter. *See id.* Whereas here, IU Credit Union's Addendum informed its members that they could "opt out" by sending written notice to IU Credit Union within 30 days but did not specify that a member assented to the Addendum by the continued use of their account. *Ante*, at 3. Simply put, IU Credit Union's members could continue to keep their accounts with IU Credit Union even if they opted out of the Addendum. *Ante*, at 12.